# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLE
## Assigned on Briefs October 15, 2013

## STATE OF TENNESSEE v. CAREY FAUGHT

### Appeal from the Criminal Court for Knox County
### No. 95611A    Bob R. McGee, Judge

### No. E2012-02419-CCA-R3-CD - Filed March 3, 2014

Carey Faught ("the Defendant") was convicted by a jury of aggravated burglary, employing a firearm during a dangerous felony, reckless endangerment, two counts of attempted aggravated robbery, and two counts of especially aggravated robbery. The trial court merged the two convictions for especially aggravated robbery and the two convictions for attempted aggravated robbery. Following a sentencing hearing, the trial court sentenced the Defendant to an effective sentence of forty-eight years' incarceration. On appeal, the Defendant challenges the sufficiency of the evidence supporting his conviction. He also argues that his conviction for employing a firearm during a dangerous felony violates principles of double jeopardy. Finally, the Defendant contends that his sentence is improper. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments
### of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Kimberly A. Parton (on appeal) and Sam Smith (at trial), Knoxville, Tennessee, for the appellant, Carey Faught.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Randall Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

A Knox County Grand Jury indicted the Defendant on two counts each of aggravated burglary, employing a firearm during a dangerous felony, especially aggravated robbery, aggravated robbery, and one count of attempted second degree murder. The Defendant proceeded to a jury trial on July 27, 2011.

Wendy Hammond testified at trial that she had known the Defendant for approximately twelve years and had two children with him. She stated that, in a phone conversation with the Defendant in 2009, the Defendant told her that "[the Defendant] and three other of his friends had went [sic] to a Mexican's home in Fountain City to attempt to do a robbery, it went bad and one of the Mexicans [("the victim")] had came [sic] at him with a knife and that he had shot the [victim]." She clarified that the Defendant relayed to her that "they shot [the victim] twice." After this conversation with the Defendant, Hammond contacted police and gave them this information. Hammond confirmed at trial that the Defendant had been friends with an individual, Gary Wayne Robinson, for as long as she had known the Defendant.

On cross-examination, Hammond denied that the reason she contacted police regarding this incident was because she was mad at the Defendant for having a relationship with another woman. She confirmed that she was aware of this relationship at the time of trial but stated that she did not learn about the relationship until after she contacted police.

Michael Mays, the custodian of records at the Knox County Emergency Communications District, testified regarding a call received on October 20, 2009, from 201 Crawford Road. He stated,

> It was a call that, when it came in, complaint his [sic] translating for someone else, but . . . a white male[,] . . . [a] black male[,] . . . a white female, [and a] black female tried to break in and shoot someone at that location. The victim was shot in the foot three times and in the head once, and is awake and breathing.

Valerie Riddley testified that she also was charged with the offenses in the present case. She stated that she had known the other accomplices, Megan Huffaker, Gary Wayne Robinson, and the Defendant, for several years. According to Riddley, on October 20, 2009, she and Huffaker were "riding around" selling crack cocaine. Huffaker decided that she wanted some pills, which Riddley called "Roxies," but Huffaker needed money for the pills.

Thus, Huffaker's plan was to go to the victim's residence and sleep with him in exchange for money.

Riddley stated that, at some point, she and Huffaker drove over to the Defendant's mother's house and that the Defendant and Robinson were standing outside. The Defendant and Robinson got in the car to ride with the two women but, according to Riddley, did not yet know Huffaker's plan. As they drove, Huffaker told the two men about her plan. When they arrived at the victim's[1] residence, Huffaker and Riddley entered the house alone. Riddley recalled that she sat on a couch and that Huffaker went into a bedroom. Once Huffaker came out of the bedroom, the two women left the house and returned to the car.

Riddley testified, "We went out to the car and [Huffaker] told [the Defendant] and [Robinson] that the [victim] had some money and so they were like, let's rob them." She clarified that "they" were the Defendant and Robinson. The women returned inside the victim's residence, and as the victim began to shut the door behind them, the Defendant and Robinson "pushed it open." Riddley continued,

> And [the Defendant] had the pistol, he was pointing it telling them to give him money. And I guess the guy didn't understand. The guy was just standing there saying something and [Robinson] started wrestling with one of the guys, the younger-looking guy, and [the Defendant] was just pointing the gun and kept telling the guy, give me your money, give me your money. And [the Defendant] would be like that (indicating) with his hand and that's when the guy understand what he was saying, so [the victim] pulled his wallet out and handed them $20 bills. And when he tried to stick his wallet back in, and [the Defendant] realized that [Robinson] was wrestling with the other, so [the Defendant] runs over to help [Robinson] and the guy runs in the kitchen and gets a knife. And when he runs back out, he holds the knife like pointing a gun and [the Defendant] just shot him.

Riddley clarified that the motion that the Defendant made was rubbing his thumb against his forefinger to indicate money.

Thereafter, Riddley opened the door and fled the house. She stated that she only witnessed the first shot but that she heard gunshots behind her as she ran to the car. Eventually, Huffaker, Robinson, and the Defendant all returned to the car, and they left. She

---

[1] Riddley did not know the names of the two men at this residence. Jeremiah Torres, the victim, testified later at trial that he lived at this residence and was shot during the encounter. His roommate, Migueal Clores, also was present during the encounter but did not testify at trial.

testified, "I asked [the Defendant] did he shoot the guy, and [the Defendant] was like, yeah, emptied my clip. And that's when he said he had nine bullets in his clip." Riddley did not call the police when she got home because the Defendant and Robinson told her not to tell anyone.

Riddley stated that two men, including the victim, were at the victim's residence when she and her friends arrived. She described one of the men as a "younger guy." When the Defendant and Robinson entered the residence, Robinson began "struggling, wrestling" with the younger male. The victim was the older male, who ran into the kitchen to grab a knife when the Defendant was not watching him.

On cross-examination, Riddley acknowledged that she had entered into an agreement with the State to testify in this proceeding in exchange for her pleading guilty and receiving ten years' probation. She confirmed that it was Huffaker's idea to rob the two men. She did not recall what any of her accomplices were wearing that evening.

Officer Sue Cox with the Knoxville Police Department ("KPD") testified that she was on patrol in Fountain City on October 20, 2009. On that evening, she was called to respond to a shooting of a victim at 201 Crawford. When she arrived, she observed a man standing in the doorway of the apartment and the victim lying on a couch inside. Officer Cox stated that the victim had injuries to his face and legs. A female also was present at the apartment and was translating for the man who had not been shot. Through this female, the younger man told Officer Cox that the suspects were two males.

Megan Huffaker testified that on October 20, 2009, she was driving in her vehicle with Riddley. She stated that she "had planned to go to [the victim's] house to prostitute to get money to buy pills." She clarified that the pills for which she needed money were Oxycodone pills. She confirmed that neither she nor Riddley had jobs at that time.

Huffaker explained that she obtained her pills from Robinson, so when she drove by to ask him for pills, he requested to ride with her to get the money. The Defendant came along as well. Huffaker testified,

> We all got in the car and I drove to the house[.] I parked [the] car and said, you know, you guys stay in here and me and [Riddley] will be right back. They said okay. So we went into the house and – well, I knocked on the door and they answered the door. At that point, I asked them, you know, did they want business. That's how you have to talk to them because they didn't understand English. They said yes. I asked them if they had condoms and they said no, so I said, okay, and we go to the car and get some. So, I went to the

car and I got two or three condoms out of the glove compartment and I went back up to the house. And at that point, I was trying to re-establish what was going to happen next. And then, [Robinson] and [the Defendant] came through the door and yelled, get down on the floor, everybody get down on the floor. So, at that point, I just ran out of the . . . apartment. And [Riddley] came out right behind me and we got to the car and I turned around and looked and [Robinson] was coming out and then I heard three or four gunshots. And then [the Defendant] came out and we got in the car and I asked questions . . . . And [Robinson] – or [the Defendant] handed me $20 and told me to just be quiet and drive. So then, I dropped them off and I haven't talked to them since.

Huffaker confirmed that she was on probation at the time of this incident and that, at the time of trial, her probation had been revoked, and she was incarcerated. She clarified that the Defendant entered the apartment before Robinson.

On cross-examination, Huffaker confirmed that she had snorted pills earlier in the day. She recalled that she had been to the victim's residence on two or three occasions. Riddley entered the residence with her "for safety," but Huffaker denied that Riddley, too, was going to prostitute herself. Huffaker did not see the gun or who the person was that was shooting.

Officer Beth Goodman with the KPD's forensic unit testified that she arrived at the scene after the victim already had been taken to the hospital. She photographed the scene and collected evidence, which included six shell casings. She then went to the hospital, photographed the victim, and collected his clothing. She identified at trial the six shell casings she collected and stated that they were .40 caliber casings. On cross-examination, Officer Goodman acknowledged that she did not find any fingerprints of the four accomplices at the apartment. On redirect examination, she stated that the likelihood of finding fingerprints on shell casings is very small.

Jeremiah Torres testified through an interpreter that on October 20, 2009, he was living at 201 Crawford with three other men. He testified regarding that night as follows:

Two women arrived and they knocked at the door. I opened the door, they asked us if we wanted business. I told them, yes. One of the them asked do you have condoms. I said no. She said, one moment, I will go get some. One of them left and the other one remained seated.

Torres further testified that, when the female returned, two men entered the house with her. One of the men had a pistol and pointed it at Torres. This man told Torres that he

wanted money, so Torres "took part of [his] wallet and . . . gave it to him." His roommate did not give the man with a pistol his wallet because he had approximately $1,000 in it. As a result, the two men began "threatening" Torres' roommate, so the roommate retreated toward his bedroom. Torres believed that the two men were going to kill his roommate, so Torres went into the kitchen and found a steak knife. As Torres approached the men with the steak knife, one of the men shot Torres once in each leg. Then, according to Torres, "they said, let's go. And as he was at the doorway towards the outside, he shot me again. That was the shot that hit me in the face."

On cross-examination, Torres denied ever having seen the two women or the two men prior to the night of the incident. He acknowledged that he could not identify at trial the person who shot him. On redirect examination, however, he recalled that he had identified in a photographic lineup the person who shot him.

Investigator Jeff Day with the KPD testified that he was assigned the present case as a violent crimes investigator. When he arrived at the scene, the victim already had been taken to the hospital. The victim's roommate gave a statement to police through a female, whom Investigator Day identified as the roommate's girlfriend. Investigator Day then went to the hospital and took a brief statement from the victim. Approximately two months after the incident, Investigator Day received an anonymous tip "about a possible shooting of a Hispanic male in Fountain City."

Eventually, Investigator Day's investigation led him to meet with Wendy Hammond, who gave a statement that was consistent with her testimony at trial. Investigator Day came to realize that she was the person who had given the anonymous tip. He then met with the victim, who picked the Defendant out of a photographic lineup. Hammond also provided nicknames of some of the Defendant's friends, which led Investigator Day to the other accomplices.

On cross-examination, Investigator Day acknowledged that the main information he received from the victim on the night of the incident was that the perpetrators were two white males. He also acknowledged that, because the Defendant is biracial, the photographic lineup did not include anyone that was white but rather "light-skinned" males. Investigator Day confirmed that, when he took the statements of the other three accomplices, each person had a different statement "to some degree[]."

On redirect examination, Investigator Day stated that the three statements were alike in that they told him that the four of them – Riddley, Huffaker, Robinson, and the Defendant – were the four individuals involved in the incident and that the Defendant was the person with the gun.

At the conclusion of the State's proof, the defense moved for a judgment of acquittal on all counts of the indictment. The trial court granted the motion for the count of aggravated burglary as to Miguel Clores but denied the motion as to all other counts of the indictment. The Defendant chose not to testify and presented no proof. Regarding the two charges of employing a firearm during a dangerous felony, the State elected that the two individual felonies be aggravated burglary and attempted second degree murder. Following deliberations, the jury found the Defendant guilty of aggravated burglary, employing a firearm during a dangerous felony as to aggravated burglary, two counts of attempted aggravated robbery, two counts of especially aggravated robbery, and the lesser included offense for attempted second degree murder of reckless endangerment. Additionally, the jury found that the Defendant was guilty of having prior felony convictions as an enhancement to his sentence for employing a firearm during a dangerous felony. The jury acquitted the Defendant for employing a firearm during the commission of a dangerous felony as to attempted second degree murder.

At the sentencing hearing, the presentence report was admitted as an exhibit without objection. The trial court took the matter under advisement and subsequently issued a sentencing order. In its order, the trial court sentenced the Defendant to eight years for his aggravated burglary conviction, ten years for his employing a firearm during a dangerous felony conviction, thirty years for each of his especially aggravated robbery convictions, eight years for each of his attempted aggravated robbery convictions, and eleven months, twenty-nine days for his reckless endangerment conviction. The trial court merged the two convictions for especially aggravated robbery and the two convictions for attempted aggravated robbery. The trial court ordered the sentences for the convictions for aggravated burglary, employing a firearm during a dangerous felony, and especially aggravated robbery to run consecutively to each other. The trial court ordered the remaining sentences to run concurrently to these sentences and to each other, for a total effective sentence of forty-eight years' incarceration. Additionally, the trial court ordered all of the sentences to run consecutively to the sentence for which the Defendant was paroled at the time of commission of the present offenses.

The Defendant filed a motion for new trial, which the trial court subsequently denied. He timely appealed, challenging the sufficiency of the evidence supporting his convictions. He also argues that his conviction for employing a firearm during a dangerous felony violates principles of double jeopardy. Finally, the Defendant contends that his sentence is improper.

## Analysis

### *Sufficiency of the Evidence*

The Defendant first argues on appeal that the evidence presented at trial is insufficient to support his convictions. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

The Defendant argues that the evidence is not sufficient to support his convictions because the State's evidence did not sufficiently corroborate the accomplice testimony at trial to establish the identity of the Defendant as the perpetrator in the crimes for which he was convicted.

In Tennessee, it is well-established that an accomplice's uncorroborated testimony cannot be the sole basis of a defendant's conviction. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); see also State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001). Specifically,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

Bough, 152 S.W.3d at 464 (quoting Bane, 57 S.W.3d at 419).

Here, the State not only presented the accomplice testimony of both Riddley and Huffaker implicating the Defendant in the crime, but the State also presented the testimony of Hammond, who stated that, in a phone conversation with the Defendant, he told her that "[the Defendant] and three other of his friends had went [sic] to a Mexican's home in Fountain City to attempt to do a robbery, it went bad and one of the Mexicans had came [sic] at him with a knife and that he had shot the Mexican." She clarified that the Defendant relayed to her that "they shot [the victim] twice." Moreover, although the victim was unable to identify the identity of the perpetrator of these crimes at trial, he previously had identified the Defendant in a photographic lineup as the individual who shot him. Accordingly, the State presented ample evidence to corroborate the accomplice testimony of Riddley and Huffaker. The Defendant is entitled to no relief on this issue.

*Double Jeopardy*

The Defendant also argues that "[his] conviction for employing a firearm during a dangerous felony (aggravated burglary) cannot stand based upon double jeopardy and due process principles." However, the Defendant solely provides argument and supporting authority as to a double jeopardy analysis. Thus, any due process argument is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").[2] Regarding his double jeopardy argument, the Defendant asserts that employing a firearm was

_____

[2] Furthermore, we note that any plain error analysis on due process grounds would not result in reversal.

an essential element of especially aggravated robbery, for which he also was convicted. Accordingly, he claims that his conviction of employing a firearm during the commission of a dangerous felony violates principles of double jeopardy and should be reversed.

Under principles of double jeopardy, an accused is protected from: (1) "a second prosecution for the same offense after acquittal;" (2) "a second prosecution for the same offense after conviction;" and (3) "multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012) (citations omitted). The Defendant's argument stems from this latter protection.

Our supreme court recently adopted the test from State v. Blockburger, 284 U.S. 299, 304 (1932) "to determine in a more straightforward manner whether multiple convictions under different statutes violate the state constitutional double jeopardy prohibition against multiple punishment." Id. at 556. "The first step of the Blockburger test is the threshold question of whether the convictions arise from the same act or transaction." Id.

Accordingly, we will consider the first question, whether the Defendant's convictions for especially aggravated robbery and employing a firearm during a dangerous felony arose out of the same act or transaction. See id. at 556. Here, both convictions arose out of the incident that occurred on October 20, 2009, which involved the same victim. Thus, the first threshold question is met.

If the answer to the first question of the Blockburger test is affirmative, then "the second step of the Blockburger test requires courts to examine the statutory elements of the offenses." Id. at 557. In so doing, we consider whether each offense includes an element which the other does not. If so, the two offenses do not constitute the "same offense" under the Blockburger test. Id.

The Defendant contends that his being convicted for employing a firearm in the commission of a dangerous felony and especially aggravated robbery violate principles of double jeopardy. Especially aggravated robbery is a robbery "(1) [a]ccomplished with a deadly weapon; *and* (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2006) (emphasis added). Robbery is defined by Tennessee statute as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a) (2010). A person commits theft of property "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a) (2010). On the other hand, according to Tennessee statute, "It is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1) (Supp. 2009). Clearly, the two offenses each have a required element which the other does not.

-10-

Especially aggravated robbery requires that the victim suffer serious bodily injury, an element not required for employing a firearm in the commission of a dangerous felony. See Tenn. Code Ann. §§ 39-13-403, 39-17-1324. Employing a firearm during the commission of a dangerous felony requires proof of the commission of a dangerous felony, an element not required for especially aggravated robbery. See id. Therefore, we conclude that the Defendant's firearm conviction does not violate principles of double jeopardy. Accordingly, the Defendant is entitled to no relief on this issue.

*Sentencing*

Finally, the Defendant challenges the length of his sentence and the trial court's ordering of partially consecutive sentences.

Prior to imposing a sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2006). Moreover, "[t]he sentence imposed should be the least severe measure

necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2006).

Our Tennessee Criminal Sentencing Reform Act ("the Sentencing Act") also mandates as follows:

> In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (2006), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

## Length of Sentence

In the trial court's sentencing order, it found that no mitigating factors applied to the Defendant's case. As to enhancement factors, the trial court considered the first statutory enhancement factor: that the Defendant had criminal convictions above those required for his range. See Tenn. Code Ann. § 40-35-114(1) (Supp. 2009). The trial court noted that the Defendant was being sentenced as a Range II offender, which required two convictions, and the Defendant had three total prior felony convictions. The trial court also considered the eighth statutory enhancement factor: that the "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(8). In so doing, the trial court noted that the Defendant's past probation had been revoked once and his parole had been revoked twice. Finally, the trial court considered the tenth statutory enhancement factor: that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(8). The trial court noted that the Defendant disabled the victim by shooting the victim in both legs and in the face.

Accordingly, the trial court sentenced the Defendant to eight years for his aggravated burglary conviction, ten years for his employing a firearm during a dangerous felony conviction, thirty years for each of his especially aggravated robbery convictions, eight years for each of his attempted aggravated robbery convictions, and eleven months, twenty-nine days for his reckless endangerment conviction. The trial court merged the two convictions for especially aggravated robbery and the two convictions for attempted aggravated robbery.

Employing a firearm during the commission of a dangerous felony, a Class C felony, carries a mandatory minimum sentence of ten years "if the defendant, at the time of the offense, had a prior felony conviction," as applicable here. See id. § 39-17-1324(h)(2). The sentencing range for a Class C felony for a Range II offender is six to ten years, see id. § 40-35-112(b)(3) (2006), so the mandatory sentence for the Defendant's employing a firearm

conviction is ten years. Therefore, the trial court properly sentenced the Defendant as to this conviction.

The Defendant concedes that the trial court properly considered the first and eighth statutory enhancement factors but contends that the trial court's consideration of the tenth statutory enhancement factor was improper. The tenth statutory enhancement factor applies to cases in which "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(8). Tennessee statute prohibits application of an enhancement factor when it is "already an essential element of the offense." Id. § 40-35-114. This Court has held that application of the tenth statutory enhancement factor is improper in the case of an armed robbery. See State v. Claybrooks, 910 S.W.2d 868, 872 (Tenn. Crim. App. 1994). However, as stated above, "a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Bise, 380 S.W.3d at 709.

Especially aggravated robbery, a Class A felony, see Tenn. Code Ann. § 39-13-403(b), has a sentencing range for a Range II offender of between twenty-five and forty years, see id. § 40-35-112(b)(1). Here, the trial court sentenced the Defendant to thirty years for each of his especially aggravated robbery convictions, which is toward the bottom of the statutory range. See id. § 40-35-112(b)(1). The sentencing range for attempted aggravated robbery, a Class C felony, see Tenn. Code Ann. §§ 39-12-107(a) (2006); 39-13-402(b) (2006), for a Range II offender is between six and ten years, see id. § 40-35-112(b)(3). In this case, the trial court sentenced the Defendant to eight years for each of his attempted aggravated robbery convictions, which is in the middle of the statutory range. See id. § 40-35-112(b)(3). Accordingly, the trial court did not abuse its discretion in determining the length of the Defendant's sentences for his especially aggravated robbery and attempted aggravated robbery convictions.

Moreover, the sentencing range for aggravated burglary, a Class C felony, see Tenn. Code Ann. § 39-14-403 (2006), for a Range II offender is between six and ten years, see id. § 40-35-112(b)(3). Here, the Defendant was sentenced to eight years for his aggravated burglary conviction, which is in the middle of the statutory range. See id. § 40-35-112(b)(3). Therefore, the trial court also did not abuse its discretion in its sentencing for the Defendant's aggravated burglary conviction.

Finally, we will review the trial court's sentence for the Defendant's reckless endangerment conviction. A trial court shall impose a misdemeanor sentence in accordance with the purposes and principles of the Sentencing Act. Id. § 40-35-302(b) (Supp. 2009). A person convicted of a misdemeanor is not entitled to the presumption of a minimum sentence. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). Reckless

endangerment, as applicable in this case, is a Class A misdemeanor, see Tenn. Code Ann. § 39-13-103(b) (2006),[3] and carries a sentence of no more than eleven months, twenty-nine days, see id. § 40-35-111(e)(1) (Supp. 2009). The trial court's sentence of eleven months, twenty-nine days, therefore, is within the authorized term for a Class A misdemeanor. Therefore, the trial court's sentence as to the Defendant's reckless endangerment sentence was proper.

Accordingly, the trial court did not abuse its discretion in determining the length of the Defendant's sentences. The Defendant is entitled to no relief on this issue.

### Consecutive Sentencing

Finally, the Defendant challenges the partial consecutive service of his sentences. Our supreme court recently held that the standard of review applicable to consecutive sentencing is "the abuse of discretion standard, accompanied by a presumption of reasonableness." State v. James Allen Pollard, __ S.W.3d __, __, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *7 (Tenn. Dec. 20, 2013). The Criminal Sentencing Reform Act of 1989 provides that a trial court may order consecutive sentences on any one or more of seven statutory bases. See Tenn. Code Ann. § 40-35-115(b) (2006). As our supreme court has recognized, the satisfaction of only one of these criteria will support consecutive service. See State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013) (citing State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003)). Additionally, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002); see also Tenn. Code Ann. §§ 40-35-102(1), -103(2); In re Sneed, 302 S.W.3d 825, 828-29 (Tenn. 2010).

With respect to consecutive sentencing, the trial court stated in its sentencing order that the entirety of these sentences would be served consecutively to the sentence for which the Defendant was paroled at the time he committed the present offenses. See Tenn. R. Crim. P. 32(c)(3)(A). The trial court also noted that it was mandatory to run the sentence for employing a firearm during a dangerous felony consecutively to the sentence for the underlying conviction, which in this case was aggravated burglary. In consideration of the statutory bases for consecutive sentencing, the trial court stated that the Defendant's record of criminal activity was extensive and that the Defendant "is a dangerous offender whose

---

[3] Although the Defendant committed the offense with a deadly weapon to enhance the offense to a Class E felony, the Defendant was convicted of misdemeanor reckless endangerment, which does not require that the offense be committed with a deadly weapon. See Tenn. Code Ann. § 39-13-103(b).

-15-

behavior indicates little or no regard for human life." See Tenn. Code Ann. § 40-35-115(b)(2), (4). The trial court further determined that: "[t]he circumstances surrounding the commission of the offense are aggravated"; "[c]onfinement for an extended period of time is necessary to protect society from the [D]efendant's unwillingness to lead a productive life and the [D]efendant's resort to criminal activity in furtherance of an anti-societal lifestyle"; and "[t]he aggregate length of the sentences reasonably relates to the offense of which the [D]efendant stands convicted." Accordingly, the trial court ordered the Defendant's sentence for especially aggravated robbery also to run consecutively to the Defendant's sentences for employing a firearm during a dangerous felony and aggravated burglary. The trial court ran the remaining sentences concurrently to these sentences, for a total effective sentence of forty-eight years' incarceration.

A review of the record in this case leads us to conclude that the evidence supports the trial court's imposition of partially consecutive sentences under Tennessee Code Annotated section 40-35-115(b). The trial court found as statutory bases for consecutive sentencing both that the Defendant's criminal activity was extensive and that the Defendant was a dangerous offender. In determining that the Defendant was a dangerous offender, the trial court analyzed and found that the Wilkerson factors applied to the Defendant in this case. Once again, the satisfaction of only one of these criteria will support consecutive service. See Dickson, 413 S.W.3d at 748 (citing Mickens, 123 S.W.3d at 394). We agree with the trial court that the Defendant's record of criminal activity is extensive. In addition to the three serious felonies at issue in this case,[4] the Defendant has previous convictions for three felonies. This history is sufficient to support the imposition of partial consecutive service as ordered in this case. Accordingly, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

---

[4] This Court has recognized that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing." State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)).